**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **Abdur Rahaman as personal representative of Sharifa Belgum and Mahamudul Hasan Hridoy**<br><br>Plaintiffs,<br><br>v.<br><br>**JCPenney Corporation, Inc., The Children's Place, Wal-Mart Stores, Inc., and the People's Republic of Bangladesh**<br><br>Defendants. | **Civil Action No.: 15-cv-619**<br><br>**Description: Negligence, Wrongful Death**<br><br>**Date Stamp:** |

## CLASS ACTION COMPLAINT

### I.      INTRODUCTION

1.      Plaintiffs, on behalf of themselves and all others similarly situated,

bring this action against the People's Republic of Bangladesh ("Bangladesh") and

"Retailer Defendants": JCPenney Corporation, Inc. ("JCP"), The Children's Place

("TCP"), and Wal-Mart Stores, Inc. ("Wal-Mart") and allege as follows.

### II.      NATURE OF THIS ACTION

2.      Plaintiffs bring this action to recover damages on behalf of class of

workers in Bangladesh, as defined more fully below (collectively, the "Class").

Plaintiffs allege that all Defendants acted negligently and/or recklessly in failing to

1

ensure safe and healthy working conditions for garment factory employees at the Rana Plaza building in Savar, Bangladesh.

3.  On April 24, 2013, Rana Plaza, an eight-story commercial building (which housed multiple garment factories), collapsed in Savar, Bangladesh. Despite significant warning signs that the building was uninhabitable (including illegal construction and at least one warning from an engineer the day before the collapse), the manufacturing companies required employees to come into work. When the building collapsed early on April 24, 2013, 1,129 people were killed and approximately 2,515 people were injured.  Many of the people killed and injured were women and children.

4.  The construction of the Rana Plaza building did not meet even basic building safety standards.  Bangladesh breached its duty to its citizens by: failing to properly inspect the building; failing to ensure compliance with local construction standards; and, most significantly, failing to ensure the safety of factory workers.

5.  Similarly, Retailer Defendants breached their duty to workers in the Rana Plaza building by failing to implement standards and oversight mechanisms designed to ensure the health and safety of workers who manufactured clothing for their stores.

6.  Defendants knew, or with the exercise of reasonable diligence, should

have known, that the Rana Plaza facility was not safe for human habitation.

7.    As a result of Defendants' unlawful conduct, thousands of workers at the Rana Plaza building in Bangladesh suffered death and/or serious bodily injury.

### III.   JURISDICTION AND VENUE

8.    This Court has subject-matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action, including claims asserted on behalf of a nationwide class, filed under Rule 23 of the Federal Rules of Civil Procedure; there are thousands of proposed Class members; the aggregate amount in controversy exceeds the jurisdictional amount or $5,000,000.00; and the Defendants are citizens of States different from that of Plaintiffs and members of the Class.  This Court also has subject matter jurisdiction over Plaintiffs and the proposed Class claims pursuant to 28 U.S.C. § 1367(a).

9.    This Court has personal jurisdiction over the People's Republic of Bangladesh pursuant to 28 U.S.C. § 1330(b).

10.    This Court has jurisdiction over Retailer Defendants because Retailer Defendants intentionally avail themselves of the District of Columbia consumer market through the promotion, sale, marketing, and distribution of their products to District of Columbia residents.  As a result, jurisdiction in this Court is proper and necessary.  Moreover, Retailer Defendants' wrongful conduct, as described herein,

foreseeably affects the District of Columbia and the United States.

11.     Venue is proper in this District under 28 U.S.C. § 1391 (a)-(d)

because, *inter alia*, substantial parts of the events or omissions giving rise to the

claim had effects in the District and/or a substantial part of property that is the

subject of the action is situated in the District.

## IV. PARTIES

### A.     Plaintiffs

12.     Plaintiff, Abdur Rahaman, is the personal representative of the

deceased, Sharifa Belgum, who died at the Rana Plaza collapse while working for

New Wave Bottoms, Ltd.  At the time of her death, Ms. Belgum was 30 years old

and a mother of four young children.  Ms. Belgum's average monthly wage, as an

operator on the third floor of the Rana Plaza building, was approximately 155 U.S.

dollars.  Ms. Belgum's partially decomposed body was recovered four days after

the Rana Plaza building collapsed.  Prior to Ms. Belgum's death, Mr. Rahaman

worked as a construction day laborer.  Currently, the caregiving responsibilities of

his four young children do not allow Mr. Rahaman to seek employment.

13.     Plaintiff, Mahamudul Hasan Hridoy, is one of the 2,515 people who

was injured in the Rana Plaza collapse in Savar, Bangladesh on April 24, 2013.

Mahamudul is 25 years old and worked at New Wave Style Ltd. as a quality

inspector producing clothing.  Following, and due to, the collapse, Mahamudul

suffered head trauma and was in a coma for 17 days and also sustained fractures to his ribs and backbone. These injuries restrict Mahamudul's mobility and cause him severe pain. Mahamudul is now unable to walk without the support of a cane. He continues to suffer from pain, headaches, and insomnia due to flash backs from the building collapse. His emotional distress is debilitating.

### B.   Defendants

14.   Defendant, the People's Republic of Bangladesh ("Bangladesh"), is a country in Southern Asia. The Capital of Bangladesh is Dhaka, which has an estimated population of more than 15.5 million people.

15.   In 2014, the estimated gross domestic product of Bangladesh was approximately 580.471 billion U.S. dollars. Bangladesh controls and owns large numbers of commercial operations within the country, including utilities, banks and other industries. As of 2013, the garment industry accounted for 77% of Bangladesh exports – making it a $20 million industry for the nation.

16.   Defendant, JCPenney Corporation, Inc. ("JCP") is a Delaware corporation headquartered at 6501 Legacy Drive, Plano, Texas, 75024. JCP operates a chain of 1,062 of retail department stores in 49 states.

17.   JCP sells merchandise and services to customers through its department stores and website. JCP conducts business throughout the United States, including in the District of Columbia.

18.     At the time of the Rana Plaza collapse in Savar, Bangladesh, JCP sourced garments for sale in stores in the District of Columbia (and other states in the United States) from factories in the Rana Plaza Building.

19.     Defendant, The Children's Place ("TCP") is a Delaware corporation headquartered at 500 Plaza Drive, Secaucus, New Jersey, 07094.  The company operates 1,107 stores throughout North America.

20.     TCP is the largest pure-play children's specialty retailer in North America.  The company sells apparel, accessories and footwear for children in department stores and on its website.  TCP conducts business throughout the United States, including in the District of Columbia.

21.     At the time of the Rana Plaza collapse in Savar, Bangladesh, TPC sourced garments for sale in stores in the District of Columbia from factories in the Rana Plaza Building.

22.     Wal-Mart Stores, Inc. ("Wal-Mart") is a Delaware corporation headquartered at 702 S.W. 8th Street, Bentonville, Arkansas, 72716.  Wal-Mart operates over 11,000 stores in 27 countries.

23.     Wal-Mart is a mass merchandiser of consumer products and is the world's largest company by revenue.  Wal-Mart conducts business throughout the United States, including in the District of Columbia.

24.     At the time of the Rana Plaza collapse in Savar, Bangladesh, Wal-

Mart sourced garments for sale in stores in the District of Columbia from factories in the Rana Plaza Building.

## V. FACTUAL ALLEGATIONS

### A. The Rana Plaza Incident

25.     Bangladesh has more than 5,000 garment factories, handling orders for nearly all of the world's top brands and retailers.  It has become the world's second-leading exporter of clothing, trailing only China, by delivering products at lower costs, in part by having the lowest wages in the world for garment workers. The number of people working in the garment industry in Bangladesh has increased from 1.6 million in 2000 to 4 million in 2013.[1]

26.     As of 2014, Bangladesh was the third largest exporter of apparel to the United States.  In U.S. dollars, Bangladesh exported $4,947,540,000.00 in clothing to the United States in 2013.

27.     Due to a lack of basic standards for workplace health and safety (and failure of the Bangladesh government and Western buyers to audit and enforce the minimal standards that do exist), workers at garment factories in Bangladesh are subjected to a number of systemic human rights violations, including harassment, intimidation and other abuses.

---

[1] http://www.nytimes.com/2013/05/23/world/asia/report-on-bangladesh-building-collapse-finds-widespread-blame.html?_r=0

28.     On April 24, 2013, Rana Plaza, an eight-story commercial building, collapsed in Savar, a sub-district in the Greater Dhaka Area, the Capital of Bangladesh.  The death toll amassed 1,129 and approximately 2,515 people were injured.

29.     Eighty percent of the workers were young women—18, 19, and 20 years of age.  Their standard shift was 13 to 14.5 hours, from 8:00am to 9:00pm or 10:30pm and only two days off per month.

30.     Young "helpers" earned 12 cents per hour, "junior operators," 22 cents per hour, and senior severs, 24 cents per hour.

31.     The Rana Plaza building was owned by Sohel Rana and housed five separate garment factories.   Sohel was a local politician affiliated with the ruling party in Bangladesh (Awami League).  In 2007, he constructed the building with consent from the Mayor of Savar, Mohammad Refat Ullah, who was also an Awami League member.

32.     Indeed, many of the politicians associated with Bangladesh's two major political parties—the Awami League and Bangladesh National Party—are either owners or have substantial ownership interests in the garment business.  Most estimates put the number of parliamentarians with investments in the garment sector at 10%.

33.     Transparency International's Corruption Perception Index 2013 ranks

Bangladesh 136th out of the 175 countries it examines.  A 2013 report by Transparency International Bangladesh concluded that corruption penetrates all levels of the garment industry and that a combination of government and private corruption creates barriers to ensuring workers' rights.

34.     The Rana Plaza building was built without observing proper building standards or Bangladesh regulations.  Emdadul Islam, chief engineer of the state-run Capital Development authority reported that Sohel had not received the proper building consent and obtained a permit for only a five-story building from the local municipality.  The building was illegally extended by three stories to a total of eight stories.  Additionally, the building was constructed using inadequate building materials.

35.     The Bangladesh government did not monitor construction of the Rana Plaza building and did not properly inspect the building to ensure compliance with local code.  Indeed, as of May 2013, it was reported that only 18 inspectors were responsible for overseeing safety conditions in more than 100,000 garment factories in and around the capital city.

36.     On April 23, 2013, cracks were noticed in the Rana Plaza building and the building was evacuated.  While the shops and bank closed immediately, Sohel Rana told the media that the building was safe.

37.     Abdur Razak Khan, an engineer, declared the building unsafe and

requested a more thorough inspection by public authorities.  Despite knowing that the building was unsafe, managers demanded workers return to work the following day.  Many workers were threatened with a month's salary cut if they did not comply.

38.     On the morning of April 24, 2013, diesel generators on the top floor of Rana Plaza began to run due to a power outage in the building.  At or around 8:57 am, the building collapsed with 3,122 workers inside.  Many of the victims were women, along with a number of their children, who were in the nursery facility within Rana Plaza.

39.     The building's collapse was foreseeable.  The Rana Plaza building had multiple problems that included:

a) the upper floors of the Rana Plaza building were illegally constructed;

b) Rana Plaza was not safe for industrial use, let alone for manufacturing requiring thousands of workers and heavy equipment;

c) the WRAP audit certification of New Wave Style Ltd. had expired in October 2012 and had not been renewed as it had been in prior years;

d) Rana Plaza building was exhibiting clear warning signs of impending collapse, and fresh structural cracks were noted in the building the day before the collapse;

e) Rana Plaza was ordered to be evacuated the day prior to or the day of the

collapse;

f) a number of large scale industrial diesel powered generators were prominently situated on several floors of Rana Plaza to deliver electricity during almost daily power outages. The vibrations that emanated from these generators caused the structure of the building to be weakened;

g) Rana Plaza did not comply with applicable regulations, building codes and building permit requirements;

h) the Rana Plaza building was constructed with poor quality construction materials and the structure of Rana Plaza lacked the necessary reinforced steel; and

i) the number of workers, heavy sewing machines and generators exerted a weight that Rana Plaza was not able to withstand.

40.    Rana Plaza was not an isolated incident, but rather a country- and industry- wide problem, as evidenced by Bangladesh's decision to shut-down 18 garment factories for safety reasons following the collapse in Savar.

41.    Indeed, before the Rana Plaza collapse, fires were the most common killer of garment workers in Bangladesh, averaging two to three fires per week during certain times.

42.    Bangladesh knew (or, with the exercise of reasonable diligence, should have known) that the Rana Plaza facility was not a safe place for

Bangladesh citizens to work.  Despite significant warning signs that collapse was imminent, Bangladesh failed to take reasonable steps to protect workers who were forced to work in the building.  As a result of Bangladesh's actions and omissions, thousands of workers died or were seriously injured.

B. Bangladesh Government Response

43.     After assessing Bangladesh's ability to mount an effective rescue operation, the United Nations concluded that they could not and offered to help rescue efforts by sending their expert search and rescue unit, the International Search and Rescue Advisory Group.  Dhaka authorities rejected UN assistance— suggesting that local emergency services were well equipped to handle the operation.

44.     However, the emergency services were not sufficient.  Days after the building collapsed, rescue and salvage operations were continuing and slow going.

45.     The Bangladesh Prime Minister, Sheikh Hasina, dismissed the events in Savar in an interview with CNN stating that "accidents happen."  Additionally, after the death toll in Rana Plaza had surpassed 530 people, Finance Minister Abul Maal Abdul Muhith remarked that the disaster wasn't "really serious."

46.     On May 1, 2013, thousands of workers protested in central Dhaka to demand safer working conditions and higher wages.  Later protests for a minimum wage of $100 (8,114 takas) a month resulted in injuries from rubber bullets and

tear gas.

47.     Sheikh Hasina ordered the arrest of Sohel Rana and four of the owners of the garment factories operating in Rana Plaza.  On June 10, 2013, seven inspectors were suspended and accused of negligence for renewing the licenses of factories in Rana Plaza.

48.     Even after the tragic events at Rana Plaza, human rights violations against factory workers (particularly those that attempt to unionize) persist in Bangladesh.  As of February 8, 2014, the U.S. Embassy in Dhaka noted increased harassment and forced resignation of workers trying to form trade unions.

49.     In 2012, prior to the Rana Plaza incident, Aminul Islam, a Bangladesh labor leader, was found tortured to death four days after he disappeared in April 2012.

50.     Human Rights Watch reported that "Factory owners sometimes use local gangsters to threaten or attack workers outside the workplace, including at their homes." As recently as March 2015, a production manager at Jeans Plus in Bangladesh was reported to routinely slap and punch young women workers for failing to meet their production goals – which were typically 150 pieces per hour.

51.     Shahidullah Azim, the Vice President of the Bangladesh Garment Manufacturers and Exporters Association (BGMEA) (which has tremendous political power in Bangladesh) commented: "We can't allow such labour leaders

and unions to destroy the industry."

C. Western Buyers and the Role of Retailer Defendants

52.     Local manufacturers and global brands rely on a system of "indirect sourcing" throughout the garment supply chain in Bangladesh.  Indirect sourcing is the routine practice of subcontracting, often through purchasing agents.  The practice is not transparent to consumers.

53.     Indirect sourcing is used as a means to increase profit margins and boost production capacity while keeping costs low.

54.     In the absence of effective government regulations and buyer oversight, the supply chain in Bangladesh is driven by the pursuit of the lowest nominal costs – undermining wages and working conditions.

55.     As contracts are subcontracted to one factory and sometimes re-subcontracted to another, margins get smaller and oversight becomes more distant. Factory owners at the bottom of the sector cannot afford the most basic investments to improve safety and working conditions.  These facilities often lack clean drinking water and toilets, conditions are cramped, and basic safety equipment is missing.

56.     Despite these issues with subcontracting, it is acknowledged by companies and persons across the industry that Bangladesh garment production in its current, low-cost, form would not be possible without subcontracting.  "People

across the sector acknowledge the reality that an extensive network of small, less

compliant factories undergirds the production capacity of the big factory groups

that maintain the primary, direct relationships with Western buyers."[2]

57.     Western buyers (including Retailer Defendants) profit from the

system of sourcing.  Although Retailer Defendants, and other Western buyers,

contain strong language in their public policies against non-transparent

subcontracting, factory owners report that many buyers turn a blind eye to the

subcontracting practice.  One owner of a mid-sized factory states "[Some] brands

want to ignore subcontractors.  They have their targets, too – 98% on-time

shipment – and they don't care how they get the products."[3]

58.     Indeed, in August 2013, Al Jazaeera's Fault Lines program broadcast

an investigative film which revealed underage workers producing Wal-Mart brand

garments.  In response to this film, Wal-Mart, from its offices in the United States,

publicly responded that it had a "zero-tolerance policy for unauthorized

subcontracting."[4]

59.     Additionally, many factory owners report that many buyers will place

orders in quantities that exceed known capacity, with the understanding that some

[2] Sarah Labowitz and Dorothee Baumann-Pauly, Business as Usual is Not an Option: Supply Chains and Sourcing after Rana Plaza, NYU Stern April 2014 at p. 18.
[3] *Id.* at 20.
[4] *Id.* at 23.

of the order will be produced elsewhere in a practice known as "oversourcing."[5]

60.     Dara O'Rourke, an expert on workplace monitoring at the University of California, Berkeley said, "Even in a situation of grave threat, when they saw cracks in the walls, factory managers [at Rana Plaza] thought it was too risky not to work because of the pressure on them from U.S. and European retailers to deliver their goods on time."  He added that the prices Western companies pay "are so low that they are at the root of why these factories are cutting corners on fire safety and building safety."[6]

61.     The garment factories in the Rana Plaza building included New Wave Style, New Wave Bottoms, Ether Tex, Phantom Apparels, and Phantom Tax.[7] These factories manufactured apparel for several brands, including brands carried and sold by Retailer Defendants.  Approximately 3,900 garment workers in total worked in these factories.  New Wave Style and New Wave Bottoms were the two factories with the greatest number of workers.

62.     At the time of the collapse, Wal-Mart was listed as a customer on Ether Tex's website, which is one of the factories in Rana Plaza.  Documents found at the scene indicate that apparel had been produced for Wal-Mart at one of the factories in Rana Plaza.  Wal-Mart uses the services of 279 factories in

---

[5] *Id.* at 21.
[6] http://www.nytimes.com/2013/04/26/world/asia/bangladeshi-collapse-kills-many-garment-workers.html
[7] http://news.priyo.com/2013/06/02/4-factory-owners-remanded-again-77672.html

Bangladesh.[8]

63.     Additionally, in April 2013, JCPenney and The Children's Place sourced garments from the Rana Plaza factory.[9]

64.     It was known to Retailer Defendants, prior to April 24, 2013, that Bangladesh factories had an extremely poor record of workplace safety standards and industrial building standards, including garment factories. There had been a recent history of serious accidents and collapses at garment factories in Bangladesh in the period immediately preceding the collapse at Rana Plaza.  Additionally, Retailer Defendants in the United States knew or should have known that the Bangladesh garment industry required significant oversight to ensure safe and healthy working conditions in garment factories, including oversight in relation to structural integrity of buildings.  The history of such incidents is as follows:

(a) Spectrum Sweater factory collapse: On April 11, 2005, the Spectrum Sweater factory, located in Savar, collapsed killing 65 garment workers and seriously injuring 80 others. The factory had degraded cement in the supporting pillars. The Spectrum factory had five illegally constructed floors which were added to the original four story structure to accommodate increased business from Western corporations. The Spectrum building was

---

[8] http://www.nytimes.com/2013/05/15/business/six-retailers-join-bangladesh-factory-pact.html
[9] http://www.newsweek.com/year-after-bangladeshs-deadly-factory-collapse-western-companies-slow-compensate-248506

found to have breached numerous applicable laws, regulations and codes including violation of its construction permit. The corporations sourcing garments from the factories failed to adequately monitor the safety of the building and the garment workers. The collapse brought global media attention to the shocking lack of building safety in Bangladesh, specifically in regard to the garment industry. At the time, the Spectrum building collapse was one of the worst industrial accidents.

(b) Phoenix Building Collapse: On February 25, 2006, the five story building which housed Phoenix Garments in Dhaka collapsed, trapping more than 300 individuals inside. The collapse killed 22 people and injured 50. Again, similar to the Spectrum building collapse, the Phoenix building was found to have breached numerous applicable laws, regulations and codes including violation of its construction permit. The corporations sourcing garments from the factories failed to adequately monitor the safety of the building and the garment workers.

(c) On or about November 25, 2000, approximately 51 garment workers died and approximately 100 others were injured in a fire at the Choudury Knitwear factory in Bangladesh;

(d) On or about 2000, approximately 12 garment workers died in a fire at the Globe Knitting Ltd. Factory in Dhaka;

(e) On or about August 8, 2001, approximately 24 garment workers died at the Mico Sweater Ltd. factory in Dhaka, due to a fire and stampede to exit the building;

(f) On or about 2002, approximately 12 garment workers died at the Global Knitting factoring due to a fire incident;

(g) On or about May 3, 2004, approximately 9 garment workers died and 50 others were injured at the Misco Supermarket building due to a fire;

(h) On or about January 6, 2005, approximately 23 workers died at the Shan Knitting factory in Narayangani due to a fire;

(i) On or about Feb. 8, 2006, a devastating fire broke out at Jamuna Spinning Mill at Shafipur in Gazipur, Bangladesh, burning at last 6 of its employees alive and injuring over 20 other workers;

(j) On or about Feb. 23, 2006, a fire destroyed the KTS Textile Industries building of four stories located in Chittagong.  The fire killed approximately 61 garment workers and left approximately 80 others injured;

(k) On or about Feb. 27, 2006, a transformer exploded and approximately 57 workers at the Imam Group of Industries in Chittagong were injured;

(l) On or about March 6, 2006, approximately 3 garment workers died and 50 others were injured in a fire at the Sayem Fashions factory in Gazipur;

(m)     On or about December 3, 2010, approximately 2 garment workers

died and 62 others were injured at the Eurotex factory in Narayanganj due to

a boiler explosion, a fire, and a stampede caused when workers tried to flee

the imminent harm;

(n) On or about Feb. 25, 2010, approximately 21 garment workers died and 50

others were injured in a fire at the Garib & Garib Newaj Company factory

located in Gazipur;

(o) On or about Nov. 24, 2012, just months before the Rana Plaza collapse, a

fire at Tazreen fashions killed approximately 115 workers and injured

approximately 200 others due to improper storage of materials, inadequate

electrical systems that were ignition sources, and an inadequate emergency

response plan; and

(p) On or about Jan 26, 2013, approximately 7 garment workers died and 50

others were injured in a fire at the Smart Export Garment Ltd. factory in

Dhaka.

65.     Retailer Defendants in the United States were aware that there was a

significant and specific risk to workers who were employed by their subcontractors

in Bangladesh.  Retailer Defendants were also aware that they could arrange,

though subcontracts with Bangladeshi companies, to have garments manufactured

at an extremely low cost and that this would allow Retailer Defendants to

maximize their profits on the sale of their brands.  However, the Retailer

Defendants were also aware that the reason subcontractors could manufacture and

supply these garments at such low costs was not only because the garment workers

were paid extremely low wages, far below those that would be paid to employees

in the United States, but also because the subcontractors often operated

substandard and unsafe factories which put garment workers at significant risk of

severe personal injury or death.

66.    The Retailer Defendants understood and reasonably foresaw that their

business practice of subcontracting with Bangladeshi garment companies would,

without adequate supervision, inspection, and audits, put those workers at risk of

suffering personal injury or death.  Therefore, the Retailer Defendants, acting in

the United States, adopted and publicly announced internal policies to ensure

workplace safety.

67.    Retailer Defendants were also aware that there were international

standards for worker health and safety which were developed to reduce the

potential harm to workers in factories in countries such as Bangladesh, who

manufacture products at extremely reduced wages and prices

68.    These international standards included the United Nation's "Guiding

Principles on Business and Human Rights: Implementing the United Nations

'Protect, Respect and Remedy' Framework" (the "UN Guiding Principles"), the

OECD Guidelines for Multinational Enterprises and the ISO 26000. They also included the accreditation standards established by an international non-profit organization dedicated to promoting safe, lawful, humane and ethical manufacturing around the world through certification of factory facilities and education called the Worldwide Responsible Accredited Production ("WRAP"). Specifically, WRAP's standards included the Production Principles and standards established in WRAP's factory certification process.

69.     The Retailer Defendants were also aware that there were national laws, standards and regulations in each jurisdiction, including Bangladesh, which were intended to govern industrial facilities and were intended to safeguard worker safety such as Bangladeshi labor law, building codes, building permit requirements, and the applicable regulations and standards.

70.     Retailer Defendants were aware that if inspections and audits were not adequate, comprehensive, and conducted in accordance with applicable industry, international, and their own, internal standards, members of the Class would be imperiled.

71.     The Retailer Defendants publicly presented, as part of their corporate profiles, to consumers in the United States to whom they intended to sell their products, that they had met fair labor standards as set forth in their policies.

72.     In late June 2013, the United States announced it would suspend

Bangladesh's trade privileges, citing concerns over safety hazards and labor violations in the garment industry.

73.     Michael Connarty, The United Kingdom's Falkirk East MP, has called on the UK Government to push through new legislation to end modern slavery by forcing major High Street companies in the UK to audit their supply chain.  The framework requests that companies make vigorous checks to ensure slave labor is not used in third world countries to produce goods.

74.     Industrial Global Union launched an online campaign in support of the Bangladesh unions' demand for labor law reform and called for changes in the law to make it easier for unions to organize workers, as well as demanding improved health and safety conditions.

75.     In response to the accident in Bangladesh and subsequent protests, retailers and NGOs met and created a new Accord on Factory and Building Safety in Bangladesh.  Wal-Mart, along with 14 other North American companies, refused to sign to accord.

76.     On July, 17, 2013 major North American retailers announced a plan to improve factory safety in Bangladesh.  The plan drew criticism for being less stringent than an accord reached among European companies, since it lacks legally binding commitments to pay for improvements.

77.     Twenty-nine brands have been identified as having sourced products

from the Rana Plaza factories, including brands sold by Defendants.  At a meeting

held in November 2013 to agree on a proposal regarding victim compensation,

only nine of the companies attended.

78.     Retailer Defendants knew, or should have known, that many of the

garments manufactured in Bangladesh, including at Rana Plaza, were (and

continue to be) made by workers who are subjected to substandard and illegal

working conditions.

79.     Despite this knowledge, Retailer Defendants, in the United States,

failed to take reasonable steps to implement policies, audits, or other oversight to

ensure that workers were safe and healthy.  As a result of Retailer Defendants'

negligence, Plaintiffs and members of the class suffered severe injury.

## VII. CLASS ACTION ALLEGATIONS

80.     Plaintiffs, Abdur Rahaman and Mahamudul Hasan Hridoy, bring this

action pursuant to Federal Rule of Civil Procedure 23(b)(3) and 23(b)(2), on behalf

of themselves and the following Class:

> All workers and/or families of deceased workers who were injured and/or
>
> died as a result of the building collapse at Rana Plaza on April 24, 2013.

81.     Excluded from the foregoing Class are Defendants, their officers, and

directors.

82.     Plaintiffs reserve the right to amend the class definition prior to class

certification.

83.     The Class consists of thousands of workers, making joinder impractical, in satisfaction of FRCP 23(a)(1).  The exact size of the Class is ascertainable through public hospital and police records.

84.     The claims of Plaintiffs are typical of the claims of the Class.  The claims of Plaintiffs and the class are based on the same legal theories and arise from the same unlawful and willful conduct, resulting in the same injury to the Plaintiffs and the Class.

85.     The class has a well-defined community of interest.  The Defendants have acted and failed to act on grounds generally applicable to Plaintiffs and the class, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the class.

86.     There are many questions of law and fact common to the claims of Plaintiffs and class members, and those questions predominate over any questions that may affect only individual class members within the meaning of FRCP 23(a)(2), 23(b)(2), and 23(b)(3).

87.     Common questions of fact and law affecting members of the Class include, but are not limited to, the following:

        a.  Whether Retailer Defendants sourced clothing from Rana Plaza;

b.   Whether Defendants knew of the substandard health and safety

conditions members of the Class faced at the factories in Rana Plaza;

c.   Whether Defendants took any action to remedy the conditions for

members of the Class at factories in Rana Plaza;

d.   Whether, as a result of Defendants' conduct, Plaintiffs and members

of Class have suffered damages; and if so, the appropriate measure of

damages to which they are entitled; and

e.   Whether, as a result of Defendants' misconduct, Plaintiffs and

members of the Class are entitled to equitable relief, including, but not

limited to, reforms in Defendants' labor practices,  and/or other relief,

and, if so, the nature of such relief.

88.   Absent a class action, most of the respective class members would
find the cost of litigating their claims to be prohibitive, and will have no effective
remedy. The class treatment of common questions of law and fact is also superior
to multiple individual actions or piecemeal litigation in that it conserves the
resources of the courts and the litigants, and promotes consistency and efficiency
of adjudication.

89.   Plaintiffs will fairly and adequately represent and protect the interests
of the members of the class. Plaintiffs have retained counsel with substantial
experience in prosecuting complex litigation and class actions.  Plaintiffs and their

counsel are committed to vigorously prosecuting this action on behalf of the other

respective class members, and have the financial resources to do so.  Neither

Plaintiffs nor their counsel have any interests adverse to those of the other class

members.

## VIII. CAUSES OF ACTION

### COUNT I: NEGLIGENCE

90.     For the purposes of Count 1, Plaintiffs repeat and reallege paragraphs

1 through 89 above.

91.     Defendants' acts and/or omissions, as described above, constitute

negligence.

92.     Defendants had a duty to Plaintiffs and members of the Class to

exercise reasonable care in order to avoid exposing Class Members to an

unreasonable risk of harm in their place of work.

93.     Defendants breached this duty by failing to ensure that the Rana Plaza

building was, among other things, constructed in accordance with state and local

regulations, habitable, and safe for workers.

94.     Defendants knew or, with the exercise of reasonable diligence, should

have known, that workers were subjected to substandard health and safety

conditions.  On information and belief, Defendants ignored warning signs

(including publicly available information regarding the safety of the Rana Plaza

27

building and previous incidents at other Bangladesh garment factories) of the imminent dangers facing workers in Rana Plaza.

95.     A proper inspection of the Rana Plaza building would have revealed the dangerous conditions to which garment workers were subjected.  Defendants breached their duty to members of the Class by failing to properly inspect the Rana Plaza factory and/or failing to take reasonable steps to protect members of the Class from known hazards.

96.     Defendants' breach was the direct and proximate cause of the damages suffered by Plaintiffs and the members of the Class as outlined herein.

97.     Plaintiffs and the other members of the Class have suffered injury as a result of Defendants' actions and omissions and seek compensatory damages. Plaintiffs further seek all costs, injunctive relief (including reforms to Defendants' labor practices), and attorneys' fees as allowed by law.

## COUNT II: WRONGFUL DEATH

98.     Plaintiff, Abdur Rahaman as personal representative of Sharifa Belgum, repeats and realleges paragraphs 1 through 89 above.

99.     As a direct and proximate result of the negligence, gross negligence, and/or reckless conduct of Defendant, Plaintiff's spouse, and the loved ones of members the Class, suffered severe injuries and death from the collapse of the

Rana Plaza building.

100.    As a result of the untimely death of their loved ones, Plaintiff and

other Members of the Class have suffered pecuniary loss, including loss of care,

maintenance, support, services, advise, counsel, and contributions of a pecuniary

value that they would, in reasonable probability, have received from their loved

ones during their lifetime had they lived.

101.    Plaintiffs and other Members of the Class have suffered mental

anguish, grief, and sorrow as a result of the deaths of their loved ones, and will

likely continue to suffer in the future.  For these losses, Plaintiffs and other Class

Members seek damages.

## IX. **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the other members

of the Class proposed in this Complaint, respectfully request that the Court enter

judgment in their favor and against Defendants, as follows:

(a)    That the Court certify the Class pursuant to Fed. R. Civ. P. 23

(b)(2) and 23(b)(3), and designate the named Plaintiffs as the representatives

of the Class;

(b)    That the Court adjudge and decree that Defendant is liable to

Plaintiffs and the members of the Class for:

(i)    Negligence

        (ii)     Wrongful Death

(c)     That the Court order Defendants:

        (i)      To pay compensatory damages to the Plaintiffs and members of the Class;

        (ii)     To pay the costs of this action, including attorneys' fees and expenses;

        (iii)   To pay pre- and post- judgment interest;

        (iv)   To require injunctive relief, including requiring Defendants to implement labor practices consistent with international standards for worker health and safety protection;

        (v)      To allow Plaintiffs to amend these pleadings to conform to evidence produced at trial; and

        (vi)   To grant such other relief as this Court may deem just and proper.

(d)     Pursuant to Fed. R. Civ. P. 38, Plaintiffs demand a jury trial on all claims so triable.

Respectfully submitted this 23th day of April, 2015.

_/s/ Jonathan Greenbaum_ _____

Jonathan Greenbaum
Barry Coburn
Kimberly Jandrain
**Coburn & Greenbaum PLLC**
1710 Rhode Island Ave. NW
2nd Floor
Washington D.C. 20036
(202) 657-5006
jg@coburngreenbaum.com
barry@coburngreenbaum.com